UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

OPTIGEN, LLC,

                           Plaintiff,
                                                              Lead Case No.
v.                                                            5:09-CV-0006
                                                              (GTS/ATB)
INT'L GENETICS, INC.; GENETIC
FULFILLMENT USA, LLC; PINPOINT
DNA TECHS., INC.; and RICHARD B.
DOBBINS,
                           Defendants.

_____

OPTIGEN, LLC,

                           Plaintiff,

v.                                                            Member Case No.
                                                              5:09-CV-0457
DNA DIAGNOSTICS, INC., d/b/a                                  (GTS/ATB)
Shelterwood Labs.; MELBA S. KETCHUM;
INT'L GENETICS, INC.; GENETIC
FULFILLMENT USA, LLC; PINPOINT
DNA TECHS., INC.; and RICHARD B.
DOBBINS,
                           Defendants.

_____

INT'L GENETICS, INC.; GENETIC
FULFILLMENT USA, LLC; PINPOINT
DNA TECHS., INC.; and RICHARD B.
DOBBINS,
                           Counter-Claimants,

v.

OPTIGEN, LLC,

                           Counter-Defendant.

_____

APPEARANCES:                                    OF COUNSEL:

HODGSON RUSS LLP                                JODYANN GALVIN, ESQ.
  Counsel for Plaintiff                         ROBERT J. LANE, JR., ESQ.
The Guaranty Building                           MELISSA N. SUBJECK, ESQ.
140 Pearl Street, Suite 100
Buffalo, New York 14202-0349

FLYNN PEELER & PHILLIPS, LLC                    CHARLES E. PEELER, ESQ.
  Counsel for Defendants Int'l Genetics, Inc.,
  Genetic Fulfillment USA, Inc., Pinpoint DNA
  Techs., Inc., and Richard B. Dobbins
517 West Broad Avenue
P.O. Box 7 (31702)
Albany, Georgia 31701

MEGGESTO CROSSETT & VALERINO, LLP               JAMES A. MEGGESTO, ESQ.
  Co-Counsel for the four-above listed Defendants
313 East Willow Street, Suite 201
Syracuse, New York 13203

KLOSS, STENGER & LoTEMPIO                        DAVID W. KLOSS, ESQ.
  Counsel for Defendants DNA Diagnostics, Inc.,
  and Melba S. Ketchum
69 Delaware Avenue, Suite 1003
Buffalo, New York 14202

GLENN T. SUDDABY, United States District Judge

## MEMORANDUM-DECISION and ORDER

Currently before the Court, in these two consolidated patent infringement actions filed by

Optigen, LLC ("Plaintiff") against the six above-captioned entities and individuals, are the

following two motions: (1) Plaintiff's motion for partial summary judgment against International

Genetics, Inc., Genetic Fulfillment USA, Inc., PinPoint DNA Technologies, Inc., and Richard B.

Dobbins (collectively "Defendants"); and (2) Defendants' motion to strike Plaintiff's motion for

partial summary judgment and Plaintiff's expert's declaration.  (Dkt. Nos. 193, 213.)  For the

reasons set forth below, Plaintiff's motion for partial summary judgment is granted in part and

denied in part; and Defendants' motion to strike is denied.

# I.     RELEVANT BACKGROUND

## A.     Plaintiff's Claims in Its Amended Complaint

Plaintiff's Amended Complaint asserts the following six claims against Defendants: (1) a patent infringement and inducing infringement claim under 35 U.S.C. § 271(a) and (b) against Defendants PinPoint DNA Technologies ("Defendant PinPoint") and Richard Dobbins ("Defendant Dobbins"); (2) a patent infringement and inducing infringement claim under 35 U.S.C. § 271(a) and (b) against Defendants InGen ("Defendant InGen") and Dobbins; (3) an inducing infringement claim under 35 U.S.C. § 271(b) against Defendant Genetic Fulfillment USA ("Defendant Genetic"); (4) a claim of making misrepresentations under the Lanham Act against Defendants InGen and Dobbins; (5) a claim of unfair competition against Defendants InGen, Dobbins, and PinPoint; and (6) a claim that Defendant Dobbins is individually liable for the first, second, fourth, and fifth of the above-described claims.  (*See generally* Dkt. No. 182 [Plf.'s Am. Compl.].)

Generally, these claims arise from the following factual allegations.  Plaintiff is in the business of providing DNA-based diagnostic services to test for inherited diseases in dogs.  (*Id.*) "United States Patent No. 5,804,388, entitled 'CHROMOSOME 9 AND PROGRESSIVE ROD-CONE DEGENERATION DISEASE GENETIC MARKERS AND ASSAYS' (the ''388 patent'), [was] issued on September 8, 1998."  (*Id.*)  "Cornell Research Foundation, Inc. is the assignee of the '388 patent, [and Plaintiff] is the exclusive licensee of the '388 patent."  (*Id.*) "United States Patent No. 7,312,037, entitled 'IDENTIFICATION OF THE GENE AND MUTATION RESPONSIBLE FOR PROGRESSIVE ROD-CONE DEGENERATION IN DOG AND A METHOD FOR TESTING SAME' (the ''037 patent'), [was] issued on December 25, 2007."  (*Id.*)  "Cornell Research Foundation, Inc. is the assignee of the '037 patent, [and Plaintiff] is the exclusive licensee of the '037 patent."  (*Id.*)  The '388 patent and '037 patent

relate to identifying whether a dog is a carrier of Progressive Rod-Cone Disease ("PRCD"), is predisposed to PRCD, or is genetically normal.[1]  (*Id.*)

In 2006, Defendant Dobbins founded Defendant PinPoint, which offered a service called "Pawsitive I.D." for the DNA testing of dogs and cats.  (*Id.*)  "When Pawsitive I.D. was purchased by a customer, the customer was sent a kit that was used to collect a tissue sample[, which would] . . . then [be] mailed . . . back to [Defendant] PinPoint for analysis." (*Id.*)  "In January 2008, [Plaintiff] notified [Defendants] PinPoint and Dobbins that their activity in selling, offering to sell, making and using genetic tests for PRCD by means of the Pawsitive I.D. testing kit constituted infringement of the '388 and '037 patents."  (*Id.*)  "By April 15, 2008, [Defendant] PinPoint was no longer offering the PRCD test."  (*Id.*)

In 2008, "[Defendant] InGen was established in . . . Freeport, Bahamas" by [Defendant] Dobbins.  (*Id.*)  "[Defendant] InGen purchased assets from PinPoint[,] including the Pawsitive I.D. product and trademark, database, and website domain names."  (*Id.*)  "The Pawsitive I.D. website (www.pawsitiveid.net) directs visitors to [Defendant] InGen's website (www.ingen.bs)." "[Defendant] Dobbins prepared the content of [Defendant] InGen's website."  "The [Defendant] InGen website states that '[Defendant] InGen now offers the test for . . . []PRCD[] that [Defendant] PinPoint was forced to withdraw in April 2008 due to patent issues. . . . [Defendant] InGen does not have these issues and has recommended the testing for this eye disease.'"  (*Id.*) "On the [Defendant] InGen website, there is a question and answer column for InGen's customers[, which] includes" statements acknowledging that [Defendant] InGen's services would amount to patent infringement if offered in the United States, Canada and/or European

---

[1]        PRCD is a hereditary retinal disease that leads to blindness in dogs.

Union.[2]  (*Id.*)  "[Defendant] InGen offers the Pawsitive I.D. testing service (including the PRCD

test) for purchase through its website, including to customers in the United States."

"[Defendant] InGen also advertises the Pawsitive I.D. testing service (including the PRCD test)

for sale within the United States."  (*Id.*)

      "[Defendant] InGen has sold the Pawsitive I.D. testing service (including the PRCD test)

to customers in the United States."  (*Id.*)  "[Defendant] InGen contracts with [Defendant]

Genetic] as a shipping contractor to fill the orders placed with [Defendant] InGen."  (*Id.*)  "When

a customer places an order through [Defendant] InGen's website, [Defendant Genetic] ships the

kit to the customer from Marietta, Georgia."  (*Id.*)  "Once the customer collects the sample from

the dog or cat, the customer ships the sample to [Defendant Genetic] at a post office box in

Atlanta, Georgia," and the sample is then forwarded to a laboratory in The Bahamas.  (*Id.*)

      Familiarity with the remaining factual allegations supporting the claims in Plaintiff's

Amended Complaint is assumed in this Decision and Order, which is intended primarily for the

review of the parties.  (*Id.*)

---

     [2]      More specifically, Plaintiff alleges that the website provides, *inter alia*, the following statements: (1) "Pawsitive ID™ was forced to discontinue certain genetic tests due to patent issues in the United States, Canada & European Union[;]" (2) "[t]hese patents[, which] prohibit unlicensed use of the scientific techniques used in the detection of genetic mutations for some diseases[,] . . . were never filed in The Bahamas and therefore it is perfectly legal and ethical to use the scientific processes needed to determine if an animal has the mutation in this jurisdiction; (3) InGen offers a PRCD test "that is covered by . . . patents for which [InGen was] previously prohibited from selling and testing"; (4) the price of the test increased "from $49.95 to $75.00" because, "[i]n order to legally offer some of [InGen's] genetic tests, [the company] needed to build a laboratory in The Bahamas[, which] has added many expenses to [the company's] product"; and (5) "InGen contracts with PinPoint DNA Technologies, Inc of Atlanta, Georgia USA to provide genetic tests that are not associated with any existing patents in the USA."

**B.     Undisputed Material Facts Presented by Plaintiff's Motion for Partial Summary Judgment**

Unless otherwise noted, the following is a general summary of the undisputed material facts presented by the parties' briefing of Plaintiff's motion.   (*Compare* Dkt. No. 93, Attach. 12 [Plf.'s Rule 7.1 Statement] *with* Dkt. No. 212 [Defs.' Rule 7.1 Response].)

Defendant Dobbins formed PinPoint, a Georgia corporation, in 2006, and was its Chief Executive Officer ("CEO") and Manager.  Defendant PinPoint offered a service called "Pawsitive I.D." for the DNA testing of dogs and cats, including genetic testing for PRCD. Defendant PinPoint's genetic testing for PRCD was carried out in the United States, specifically by Texas A&M University's Doctor Eleanore Conant ("Dr. Conant").  In January 2008, Plaintiff sent a cease-and-desist letter informing Defendants Dobbins and PinPoint that its PRCD testing method infringed on both the '388 and '037 patents.  After receiving Plaintiff's cease-and-desist letter, Defendant PinPoint continued to sell the service for genetic testing for PRCD. Approximately 1,600 infringing tests were sold by Defendant PinPoint after it received Plaintiff's cease-and-desist letter.

Defendant InGen is a Bahamian corporation with an address of The Bloneva Building, Freeport, The Bahamas.  Defendant Dobbins is the sole owner, General Manager, and CEO of Defendant InGen. Defendant InGen was established in 2008, in direct response to Plaintiff's allegations of patent infringement in its cease-and-desist letter and for the sole purpose of offering patent-protected genetic tests from an offshore site where the patents-in-suit were not registered.  Defendant InGen offers diagnostic services to test for genetic diseases in dogs, including the testing for PRCD.  Defendant InGen maintains that it purchased assets from Defendant PinPoint, including the Pawsitive I.D. product and trademark, database, and website

names; however, it is disputed among the parties whether Defendant InGen gave consideration in exchange for Defendant PinPoint's assets.[3]

Defendant InGen operates out of an office located at 1395 Cobb Parkway, N.W., Marietta, Georgia.  Sherrill Williams ("Williams") is the sole employee of Defendant InGen and began working there on January 1, 2010.  Williams is Defendant InGen's Operations Manager, and she works exclusively out of the Marietta office.  Williams has never traveled to The Bahamas.  Williams was a Defendant PinPoint employee until December 31, 2009.

Defendant InGen has no employees in The Bahamas.  Defendant Dobbins conducts most of his supervision of Defendant InGen's business from Georgia and infrequently visits The Bahamas.

Defendant InGen's phone and facsimile numbers begin with a "678" area code, which is the area code for the Atlanta area.  Defendant InGen sends shipments from, and receives shipments at, its Georgia location.

Defendant InGen maintains a website accessible to customers located in the United States.  The website is powered by a server located in The Bahamas.  The website allows anyone viewing the website to order Defendant InGen's genetic testing products, including the PRCD test.  Defendant InGen offers its genetic testing services for sale through its website to customers located in the United States.  In addition, Defendant InGen actually sells its genetic testing services to customers located in the United States.  Payment for products can be made on Defendant InGen's website; and customers within the United States can access testing results

---

[3]     Specifically, Plaintiff asserts that "InGen gave no consideration to PinPoint for PinPoint's assets."  (Dkt. No. 193, Attach. 12 at 3.)  However, in response, Defendants assert that "[Defendant] InGen agreed to a stock swap in exchange for [Defendant] PinPoint's assets. That the stocks swap has not been completed does not mean there was no consideration for [Defendant] InGen's purchase of [Defendant] PinPoint's assets."  (Dkt. No. 212 at 3.)

through Defendant InGen's website.  Defendant InGen has mailed advertisements for its testing services from its address in Marietta, Georgia, to customers located in the United States.  Approximately 80% to 85% of Defendant InGen's customers are located in the United States.

Defendant Genetic is located in the same office as is Defendant InGen.  It has one employee, Brian Walker ("Walker"); however, Williams and Defendant Dobbins have assisted Walker with his duties at Defendant Genetic.  Defendant Genetic does not have its own telephone number, facsimile number, or email account.  Defendant Genetic's only customers are Defendants InGen and PinPoint.  When a customer places an order through Defendant InGen's website, Defendant Genetic receives a notice, assigns an identification number to the test purchased, packages a kit for the customer to collect a sample of hair (or other specimen) from its dog, and then ships the kit to the customer through FedEx.  Once the customer collects the sample from its dog, the customer ships the sample back to Defendant Genetic in Marietta, Georgia.  Defendant InGen then contracts with AZCO Biotech in San Diego, California for DNA extraction services.[4]  Once Defendant InGen receives the DNA extraction from AZCO Biotech, it forwards the DNA sample to its laboratory in Freeport, The Bahamas, for testing.

Defendant InGen has an agreement with Chela-Tech Laboratories ("Chela") under which Chela runs the genetic tests using its own employees.  Dr. Conant (from Texas A&M University) trained a Chela laboratory technician on PRCD testing on two separate occasions.  In addition, Dr. Conant traveled to The Bahamas to conduct PRCD testing in 2009.  Defendant InGen does not own or operate a laboratory in The Bahamas.

---

[4]     Defendant InGen does not have a DNA extraction facility in The Bahamas.

Familiarity with the action's remaining undisputed material facts, as well as the action's disputed material facts, as set forth in the parties' Rule 7.1 Statement and Rule 7.1 Response, is assumed in this Decision and Order, which (again) is intended primarily for review by the parties.

### C. Parties' Briefing on Plaintiff's Motion for Partial Summary Judgment

Generally, in support of its motion for partial summary judgment, Plaintiff makes the following six arguments: (1) Defendants PinPoint and Dobbins infringed (and admitted to infringing)[5] upon Plaintiff's '388 and '037 patents by offering for sale, selling, and performing the patented method of detecting PRCD to customers in the United States, including selling approximately 1,600 genetic tests for PRCD after Defendants PinPoint and Dobbins received Plaintiff's cease-and-desist letter; (2) Defendants InGen and Dobbins infringed (and continue to infringe) upon Plaintiff's '388 and '037 patents by offering to sell and selling the patented PRCD testing method to customers in the United States, even though (a) the actual testing is conducted

---

[5]       Plaintiff identifies the following three statements that, according to Plaintiff, are "admissions" by Defendants establishing that Defendants PinPoint and Dobbins have practiced the claims in Plaintiff's '388 and '037 patents: (1) Defendant InGen's website stated that "PinPoint may have some infringement liability due to its selling the PRCD test up until April 1, 2008"; (2) Defendant InGen's website indicated that it now offers the PRCD testing that Defendant PinPoint was forced to withdraw in April 2008 due to patent issues; and (3) Defendant Dobbins wrote in an email dated October 27, 2008, in which he stated that his "analysis found very limited methods to 'work around' the ['037] patent" because "the patent was very strong and that it probably would prohibit any lab from using this process within the jurisdiction covered by the patent without obtaining a license."  (Dkt. No. 193, Attach. 1 at 17.) In addition, the Court notes that Plaintiff adduced evidence that Defendants made several statements on their website indicating that, while Defendants were not violating the law in The Bahamas, they were doing so in the United States: (1) "InGen . . . conduct[s] certain genetic tests using a method that is patent protected in the United States"; (2) "Many of our Premium Tests have methods that have been patented in certain jurisdictions"; (3) "Some of the [scientific] methods [used in certain genetic tests marketed and sold by Defendant InGen] have been patented in the United States . . . .  These method patents prohibit unlicensed use of the scientific techniques used in the detection of mutations for some diseases within [the United States] . . . ."; and (4) "There are no previous or existing patents issued for PRCD in The Bahamas.  This being the case, [InGen] is not violating any Bahamian or international patent laws by processing the PRCD test."  (Dkt. No. 195, Attach. 1 at 5, 15, 16, 34.)

outside the United States, and (b) the offers to sell and sales are made through a website powered by a foreign server; (3) Defendant InGen and Dobbins have violated the Lanham Act by misrepresenting the status of Defendant InGen's operations, as well as the nature, quality, and characteristics of its products; (4) Defendants InGen, PinPoint, and Dobbins are liable for unfair competition under New York law because they have "utilized [P]laintiff's intellectual property for their own benefit" by "intentionally and wrongfully divert[ing] [Plaintiff's] business to themselves"; (5) Defendant InGen is liable as a successor to Defendant PinPoint for Defendant PinPoint's infringement because (a) Defendants PinPoint and InGen engaged in a "de facto merger," or (b) Defendant InGen is a "mere continuation" of Defendant PinPoint's business; and (6) Defendant Dobbins is personally liable for Defendants InGen and PinPoint's infringement because he "dominates every aspect of both" corporations.  (*See generally* Dkt. No. 193, Attach. 1.)  Based on these six arguments, Plaintiff moves for partial summary judgment on its First, Second, Fourth, Fifth, and Sixth Causes of Action, as set forth in its Amended Complaint.[6]  (*See generally* Dkt. No. 182.)

Generally, in their response, Defendants make the following five arguments: (1) Plaintiff's motion for partial summary judgment on the patent infringement claims against PinPoint, Dobbins and InGen fails because (a) Plaintiff neglects to include in its motion a

---

[6]    The Court notes that Plaintiff's First and Second Causes of Action, as set forth in Plaintiff's Amended Complaint, actually contain two separate claims–one for direct infringement under 35 U.S.C. § 271(a), and a second for inducing infringement under 35 U.S.C. § 271(b). (*See generally* Dkt. No. 182.)  Plaintiff's papers in support of its motion for partial summary judgment, however, only contain arguments related to a direct infringement claim under 35 U.S.C. § 271(a).  More specifically, Plaintiff's memorandum of law only recites the law as to direct infringement.  (Dkt. No. 193, Attach. 1 at 15-16.)  In addition, the phrase "inducing infringement" is completely absent from Plaintiff's memorandum of law.  (*See generally* Dkt. No. 193, Attach. 1.)  As a result, the Court construes Plaintiff's motion for partial summary judgment on its First and Second Causes of Action as relating only to its claims of direct infringement under 35 U.S.C. § 271(a).

meaningful claim construction, and (b) Defendants' PRCD testing method takes place outside of the United States, which, to the extent that testing method infringes on Plaintiff's United States patents, insulates them from liability; (2) Plaintiff has failed to prove that the five-identified statements are either literally false or misleading; (3) because Defendants InGen, PinPoint, and Dobbins are not liable for patent infringement, they cannot be liable for unfair competition; (4) because Plaintiff, as a patent licensee, did not expend labor or talent producing the patented methods, it does not have a claim for unfair competition; (4) because several material facts are in dispute as to whether Defendant InGen is liable as a successor to Defendant PinPoint, this claim is more appropriately decided by a factfinder at trial; and (5) Defendant Dobbins is not personally liable for the alleged patent infringement because he is not the "alter ego" of either Defendants PinPoint or InGen.  (Dkt. No. 213, Attach. 1 at 13-25.)

Generally, in its reply, Plaintiff makes the following five arguments: (1) because Defendants have failed to raise a triable dispute of material fact as to Plaintiff's patent infringement claims, Plaintiff's motion on this claim is unopposed; (2) Defendants InGen and Dobbins continue to misrepresent the operations of Defendant InGen's business activity in violation of the Lanham Act; (3) Plaintiff's argument of unfair competition is unopposed by Defendants because Defendants do not dispute that they have "engaged in a marketing scheme intended to harm [Plaitniff's] reputation;" (4) Defendants admit to the pertinent facts demonstrating that Defendant InGen is liable for Defendant PinPoint's infringement as successor to Defendant PinPoint; and (5) Defendant Dobbins "dominates" Defendants PinPoint and InGen. (Dkt. No. 216 at 4-9.)

D.      **Parties' Briefing on Defendants' Motion to Strike Plaintiff's Motion for**
        **Partial Summary Judgment and Its Expert Declaration**

Generally, in support of their motion to strike, Defendant makes the following

arguments: (1) Plaintiff's motion for partial summary judgment is untimely because it was filed

after the deadline imposed by Magistrate Judge Baxter's Order dated July 12, 2011 ("the July

Order"); and (2) Plaintiff's expert declaration may not be considered in support of Plaintiff's

motion for partial summary judgment because Plaintiff's expert disclosure is untimely and does

not comply with Fed. R. Civ. P. 26(a)(2)(B). (*See generally* Dkt. No. 211, Attach. 1 at 6-13.)

More specifically, regarding their motion to strike Plaintiff's motion for partial summary

judgment, Defendants argue that Plaintiff's motion is untimely because it was filed after the

September 3, 2010, motion deadline set by Magistrate Judge Baxter in his Order dated March 24,

2010 ("the March Order"). (Dkt. No. 213, Attach. 1 at 7-8.) Defendants make this argument

notwithstanding Magistrate Judge Baxter's July Order permitting "any further substantive

motions, to the extent not inconsistent with District Judge Suddaby's prior orders and opinions,

[to] be filed by 9/30/11." (Dkt. No. 190.) Defendants argue, however, that the July Order

(which also Ordered Defendant Dobbins to produce certain personal tax returns and bank

records) allowed motions to be filed up until September 30, 2011, only if they relate to or arise

from Defendant Dobbins' disclosure of his tax returns and bank records. (Dkt. No. 213, Attach.

1 at 7 [arguing that "the Court also extended the period to file 'substantive' motions arising out

of information obtained during this limited scope discovery extension until September 30,

2011"].) As a result, according to Defendants, because Plaintiff's motion for partial summary

judgment arises from information that Plaintiff had in its possession long-before the July Order

and does not relate to Defendant Dobbins' tax returns or bank records, Plaintiff was required to

file its motion by September 3, 2010, in accordance with the March Order. (*Id.* at 8-9.)

Regarding their motion to strike Plaintiff's expert declaration, Defendants argue that the Court should strike Dr. Gregory Acland's declaration because Plaintiff's disclosure of this expert witness is (1) untimely (in that Plaintiff was required to make its expert disclosures by March 26, 2010, but did not disclose its expert, Dr. Gregory Acland, until  June 23, 2011), and (2) not in compliance with Fed. R. Civ. P. 26 (in that the disclosure was not accompanied by a valid report).[7]  (Dkt. No. 211 at 12-13.)

In response, Plaintiff makes the following arguments: (1) its motion for partial summary judgment is timely because it complies with the July Order; (2) because its expert disclosure was timely under Fed. R. Civ. P. 26(a)(2)(B), its expert declaration should be considered; and (3) it was not required to submit an expert report pursuant to Fed. R. Civ. P 26(a)(2)(B) because Dr. Gregory Acland ("Dr. Acland") is not a witness that is "retained or specially employed to provide expert testimony in the case or one whose duties as [Plaintiff's] employee regularly involve[s] giving expert testimony."   (*See generally* Dkt. No. 216 at 6-11.)

## II.    RELEVANT LEGAL STANDARDS

### A.    Legal Standard Governing Motions for Summary Judgment

Because the parties to this action have demonstrated, in their memoranda of law, an accurate understanding of the legal standard governing motions for summary judgment, the

---

[7]     Fed. R. Civ. P. 26(a)(2)(B) provides, in pertinent part, as follows:

> **(B)**   *Witnesses Who Must Provide a Written Report*. Unless otherwise stipulated or ordered by the court, [an expert witness] disclosure must be accompanied by a written report–prepared and signed by the witness–if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's regularly involve giving the expert testimony.

Fed. R. Civ. P. 26(a)(2)(B).  Defendants argue that, because Plaintiff's disclosure did not contain Dr. Acland's signature and does not include a report from Dr. Acland, it violates Fed. R. Civ. P. 26(a)(2)(B).

Court will not recite that well-known legal standard in this Decision and Order, but will direct the reader to the Court's decision in *Pitts v. Onondaga Sheriff's Dep't*, 04-CV-0828, 2009 WL 3165551, at *2-3 (N.D.N.Y. Sept. 29, 2009) (Suddaby, J.), which accurately recites that legal standard.

### B. Legal Standards Governing Relevant Portions of Plaintiff's Claims

#### 1. Claims of Patent Infringement Under 35 U.S.C. § 271(a)

When resolving patent infringement claims, a court must undergo a two-step analysis. "The first step is determining the meaning and scope of the patent claims asserted to be infringed. . . . The second step is comparing the properly construed claims to the device accused of infringing." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). "The first [step] presents a legal question to be resolved by the courts, while [question presented in the second step] is generally reserved for the fact finder." *Pall Corp. v. Cuno Inc.*, 03-CV-0092, 2007 WL 2363019, at *3 (E.D.N.Y. Aug. 14, 2007) (citing *Markman*, 52 F.2d at 981 [noting, however, that a court may use its construction of the claim in framing its jury charge, as well as in deciding dispositive motions]). In addition, it is important to note that, in the second step, "[t]o establish infringement, every limitation set forth in a patent claim must be found in an accused product or process exactly or by a substantial equivalent." *Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1535 (Fed. Cir. 1991), *accord*, *AztraZeneca AB v. Dr. Reddy's Labs., Ltd.*, 603 F. Supp.2d 596, 600 (S.D.N.Y. 2009).

#### 2. Claims of Misrepresentation Under the Lanham Act

The Lanham Act provides, in pertinent part, as follows:

> Any person who, on or in connection with any goods or services, . . . uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or misleading representation of fact which . . . in commercial advertising or promotion, misrepresents the nature,

> characteristics, qualities, or geographic origin of his or her or another
> person's goods, services, or commercial activities, shall be liable in a civil
> action by any person who believes that he or she is or is likely to be
> damaged by such act.

15 U.S.C. § 1125(a)(1)(B).  "A claim of false advertising may be based on at least one of two

theories: 'that the challenged advertisement is literally false, i.e., false on its face,' or 'that the

advertisement, while not literally false, is nevertheless likely to mislead or confuse consumers.'"

*Tiffany Inc. v. eBay Inc.*, 600 F.3d 93, 112 (2d Cir. 2010) (quoting *Time Warner Cable, Inc. v.*

*DIRECTV, Inc.*, 497 F.3d 144, 153 [2d Cir. 2007]).

"When an advertisement is shown to be literally false . . . consumer deception is

presumed, and 'the court may grant relief without reference to the advertisement's [actual]

impact on the buying public.'"  *Time Warner Cable, Inc.*, 497 F.3d at 153 (quoting *Coca-Cola*

*Co. v. Tropicana Prods., Inc.*, 690 F.2d 312, 317 [2d Cir. 1982]).  "'This is because plaintiffs

alleging a literal falsehood are claiming that a statement, on its face, conflicts with reality, a

claim that is best supported by comparing the statement itself with the reality it purports to

describe.'"  *Time Warner Cable, Inc.*, 497 F.3d at 153 (quoting *Schering Corp. v. Pfizer Inc.*,

189 F.3d 218, 229 [2d Cir. 1999]).

On the other hand, "'plaintiffs alleging an implied falsehood are claiming that a

statement, whatever its literal truth, has left an impression on the listener [or viewer] that

conflicts with reality'–a claim that 'invites a comparison of the impression, rather than the

statement, with the truth.'"  *Id.*  "A district court *must* rely on extrinsic evidence [of consumer

deception or confusion] to support a finding of an implicitly false message."  *Schering Corp.*,

189 F.3d at 229 (internal quotation marks omitted).

"Under either theory, the plaintiff must also demonstrate that the false or misleading

representation involved an inherent or material quality of the product."  *Time Warner Cable,*

*Inc.*, 497 F.3d at 153 n.3.  In addition, under either theory, the injuries must be "the result of public deception."  *Johnson & Johnson * Merck Consumer Pharm. Co. v. Smithkline Beecham Corp.*, 960 F.2d 294, 298 (2d Cir. 1992).

### 3.    Claims of Unfair Competition Under New York Law

Under New York law, to establish an unfair competition claim, a plaintiff must show two things: "(1) unauthorized reproduction and distribution of the plaintiff's work; and (2) the existence of 'competition in the marketplace or similar actions designed for commercial benefit.'" *Arista Records LLC v. Lime Group LLC*, 784 F. Supp.2d 398, 437 (S.D.N.Y. 2011) (applying New York law) (quoting *Capitol Records, Inc. v. City Hall Records, Inc.*, 07-CV-6488, 2008 WL 2811481, at *4 [S.D.N.Y. July 18, 2008]).

### 4.    Claim of Successor Liability Under New York Law

Under New York law, a corporation that acquires the assets of another corporation is not liable for the torts of its predecessor unless one of the following exceptions apply:

> (1) the successor corporation expressly or impliedly assumed the predecessor's tort liability; (2) *there was a consolidation or merger of seller and purchaser*; (3) *the purchasing corporation was a mere continuation of the selling corporation*; or (4) the transaction is entered into fraudulently to escape tort liability obligations.

*Klumpp v. Bandit Indus., Inc.*, 113 F. Supp.2d 567, 571 (W.D.N.Y. 2000) (quotation marks omitted; emphasis added).  Here, Plaintiff argues that Defendant InGen's purchase of Defendant PinPoint was (1)  a "de facto merger" of Defendant PinPoint and Defendant InGen, or (2) a "mere continuation" of Defendant PinPoint's business by Defendant InGen.  (Dkt. No. 193, Attach. 1 at 28.)

Regarding the "de facto merger" theory of successor liability, New York courts have held as follows:

> [a] transaction structured as a purchase-of-assets may be deemed to fall
> within [the de facto merger] exception . . ., even if the parties chose not to
> effect a formal merger, if the following factors are present: (1) continuity
> of ownership; (2) cessation of ordinary business operations and the
> dissolution of the selling corporation as soon as possible after the
> transaction; (3) the buyer's assumption of the liabilities ordinarily
> necessary for the uninterrupted continuation of the seller's business; and
> (4) continuity of management, personnel, physical location, assets and
> general business operation.

*In re New York City Asbestos Litigation*, 15 A.D.3d 254, 256 (N.Y. App. Div., 1st Dep't 2005)

(citing *Fitzgerald v. Fahnestock & Co.*, 286 A.D.2d 573, 574 [N.Y. App. Div., 1st Dep't 2001]).

Although not all factors must be present to find a de facto merger, "[i]t has been held that,

because continuity of ownership is 'the essence of a merger,' it is a necessary element of any de

facto merger finding, although not sufficient to warrant such a finding by itself." *In re New York*

*City Asbestos Litigation*, 15 A.D.3d at 256 (quoting *Cargo Partner AG v. Albatrans, Inc.*, 352

F.3d 41, 47 [2d Cir. 2003] [applying New York law]).  Moreover, "[s]o long as the acquired

corporation is shorn of its assets and has become, in essence, a shell, legal dissolution is not

necessary before a finding of a de facto merger will be made." *Fitzgerald*, 286 A.D.2d at 575

(citations omitted).

Regarding the "mere continuation" theory of successor liability, New York courts have

held that the term "mere continuation" "refers to corporate reorganization, . . . where only one

corporation survives the transaction; the predecessor corporation must be extinguished."

*Schumacher v. Richards Shear Co., Inc.*, 59 N.Y.2d 239, 245 (N.Y. 1983).

### 5.      Claim of Individual Liability Under New York Law

In New York, "the courts will disregard the corporate form, or, to use accepted terminology, 'pierce the corporate veil', whenever necessary 'to prevent fraud or to achieve equity.'" *Walkovszky v. Carlton*, 18 N.Y.2d 414, 417 (N.Y. 1966) (quoting *Int'l Aircraft Trading Co. v. Mfrs. Trust Co.*, 297 N.Y. 285, 292 [N.Y. 1948]).  "[W]henever anyone uses control of the corporation to further his own rather than the corporation's business, he will be liable for the corporation's acts 'upon the principle of *respondeat superior* applicable even where the agent is a natural person.'" *Walkovszky*, 18 N.Y.2d at 417 (quoting *Rapid Tr. Subway Constr. Co. v. City of New York*, 259 N.Y. 427, 488 [N.Y. 1932]).  "Generally, a plaintiff seeking to pierce the corporate veil must show that 'complete domination' was exercised over a corporation with respect to 'the transaction attacked,' and 'that such domination was used to commit a fraud or wrong against the plaintiff [that] resulted in plaintiff's injury.'" *Williams v. Lovell Safety Mgmt. Co., LLC*, 71 A.D.3d 671, 671 (N.Y. App. Div., 2d Dep't 2010) (quoting *Matter of Morris v. New York State Dept. of Taxation & Fin.*, 82 N.Y.2d 135, 141 [N.Y. 1993]).  Standing alone, complete domination is not enough to pierce the corporate veil; "some showing of a wrongful or unjust act toward the plaintiff is required."  *Morris*, 82 N.Y.2d at 141-42.  "The decision whether to pierce the corporate veil will depend upon the facts and circumstances of each case."  *Austin Powder Co. v. McCullough*, 216 A.D.2d 825, 826 (N.Y. App. Div., 3d Dep't 1995).

III.    **ANALYSIS**

A.    **Defendants' Motion to Strike Plaintiff's Motion for Partial Summary Judgment and Its Expert Declaration**

As discussed in Part I.D. of this Decision and Order, Defendants have moved the Court to strike Plaintiff's motion for partial summary judgment and its expert declaration.  The Court addresses each request below.

1.    **Defendants' Motion to Strike Plaintiff's Motion for Partial Summary Judgment**

After carefully reviewing the parties' arguments, the docket, and the deadlines imposed by the Court and Magistrate Judge Baxter, the Court finds Defendants' arguments unpersuasive for three reasons.  First, the July Order does not provide any limitation on the motions permitted to be filed by the parties up until September 30, 2011, except that they were not to be "inconsistent with District Judge Suddaby's prior orders and opinions."  (Dkt. No. 190.)  Second, Plaintiff's motion for partial summary judgment is not inconsistent with any of the Orders and opinions issued through the date of the July Order.  (*See generally* Docket Sheet.)  Third, even if Defendants' argument has merit (which it does not), the Court may, in its discretion, agree to consider the motion "as long as the losing party was on notice that such party was required to come forward with all necessary evidence." *Hastie v. J.C. Penny Co., Inc.*, 886 F. Supp. 1017, 1030-31 (W.D.N.Y. 1994).

Here, that discretion is properly exercised.  Defendants were on notice that the Court might decide Plaintiff's motion on the merits "[b]y virtue of the fact that [Plaintiff] did file a summary judgment motion . . ., [and] no ruling had been made as to the untimeliness of the motion." *Hastie*, 886 F. Supp. at 1031; *see also Horton v. Williams*, 08-CV-0513, 2010 WL 3338920, at *2 (N.D.N.Y. 2010) (Suddaby, J.).  Indeed, Defendants (1) filed a memorandum of

19

law in opposition to Plaintiff's motion, (2) filed a response to Plaintiff's Statement of Material

Facts and set forth additional material facts, (3) supported its opposition with record evidence,

and (4) filed a motion.  (Dkt. Nos. 211, 213.)

For all of these reasons, the Court denies Defendants' motion to strike Plaintiff's motion

for partial summary judgment.

### 2.      Defendants' Motion to Strike Plaintiff's Expert Declaration

### a.      Timeliness of Plaintiff's Expert Disclosure

After carefully reviewing the parties' arguments, the relevant Orders by formerly

presiding District Judge Gary L. Sharpe and Magistrate Judge Baxter, the Local Rules of

Practice for the Court, and the Federal Rules of Civil Procedure, the Court finds that Plaintiff's

expert disclosure was not timely, because Plaintiff's disclosure did not comply with the Local

Rules of Practice for the Court and Judge Sharpe's Amended Pretrial Scheduling Order.[8]  More

specifically, the parties' disclosures of experts that are not "retained or specially employed to

provide expert testimony in the case or whose duties as an employee of the party regularly

involve giving expert testimony" (Dkt. No. 43 at 2) was due "before the completion of discovery

in accordance with the deadlines contained in the Uniform Pretrial Scheduling Order . . . ."

N.D.N.Y. L.R. 26.3.  Judge Sharpe's Amended Pretrial Scheduling Order required that "[a]ll

discovery in this matter is to be completed on or before March 26, 2010" (Dkt. No. 43 at 2);

however, Magistrate Judge Baxter's March Order extended that deadline by three months  (Dkt.

---

[8]      Pursuant to Local Rule 26.3 of the Local Rules of Practice for this Court, the
deadline for disclosing expert witnesses in this case was governed by Judge Sharpe's Amended
Uniform Pretrial Scheduling Order ("Amended Pretrial Scheduling Order").  *See* N.D.N.Y. L.R.
26.3 ("There shall be binding disclosure of the identity of expert witnesses.  The parties shall
make such disclosure . . . before the completion of discovery in accordance with the deadlines
contained in the Uniform Pretrial Scheduling Order or any other Court Order.").

No. 121 at 5).  As a result, the parties' disclosure of experts that are not "retained or specially employed to provide expert testimony in the case or whose duties as an employee of the party regularly involve giving expert testimony" (Dkt. No. 43 at 2) was due on June 26, 2010. Plaintiff did not disclose its expert until June 23, 2011, more than one year after the deadline imposed by the Orders and Local Rules governing disclosure.  (Dkt. No. 211, Attach. 8.) Accordingly, the Court finds Plaintiff's expert disclosure of Dr. Acland to have been untimely.

Plaintiff's failure to timely disclose its expert witness implicates Fed. R. Civ. P. 16(f) and Fed. R. Civ. P. 37.  Rule 16(f) of the Federal Rules of Civil Procedure provides that the Court "*may* issue any just orders, including those authorized by [Fed. R. Civ. P.] 37(b)(2)(A)(ii)-(vii), if a party or its attorney . . . (C) fails to obey a scheduling or other pretrial order."  Fed. R. Civ. P. 16(f)(1) (emphasis added).  It further provides that the Court "must order the [violating] party, its attorney, or both to pay reasonable expenses–including attorney's fees–incurred because of any noncompliance with this rule, unless the noncompliance was substantially justified or other circumstances make an award unjust."  Fed. R. Civ. P. 16(f)(2).  Rule 37 of the Federal Rules of Civil Procedure provides that "[i]f a party fails to . . . identify a witness as required by [Fed. R. Civ. P.] 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or harmless."  Fed. R. Civ. P. 37(c)(1).

"Preclusion [of an expert's testimony] is a somewhat harsh remedy, because of its obvious effect of depriving the court and finder of fact of otherwise potentially relevant information to be used in deciding the issues in the case."  *LaVigna v. State Farm Mut. Auto. Ins. Co.*, 736 F. Supp.2d 504, 511 (N.D.N.Y. 2010) (Sharpe, J.) (internal quotation marks omitted). "Imposition of sanctions under [Fed. R. Civ. P.] 37 is [also] a drastic remedy and should only be

applied in those rare cases where a party's conduct represents bad faith and callous disregard of the Federal Rules of Civil Procedure." *Hinton v. Patnaude*, 162 F.R.D. 435, 439 (N.D.N.Y. 1995) (McAvoy, C.J.). "The touchstone for determining whether to exclude an untimely expert report is whether the party opposing their admission is prejudiced." *Lore v. City of Syracuse*, 00-CV-1833, 2005 WL 309506, at *4 (N.D.N.Y. Nov. 17, 2005) (Munson, J.).

After carefully considering the matter, the Court finds that Plaintiff's untimely disclosure does not warrant preclusion or sanctions for two reasons. First, Plaintiff has demonstrated that it relied, in good faith, on the 90-day rule contained in Fed. R. Civ. P. 26, which provides that "[a]bsent a stipulation or a court order, the [expert] disclosures must be made. . . at least 90 days before the date set for trial or for the case to be ready for trial. . . ." Fed. R. Civ. P. 26(a)(2)(D). In addition, and more importantly, there is no evidence to suggest that Plaintiff's conduct was a "callous disregard" for the applicable rules governing expert disclosures. *Hinton*, 162 F.R.D. at 439 (McAvoy, C.J.).

Second, there is no evidence that Defendants have been prejudiced by Plaintiff's expert's untimely disclosure for the reasons stated in Plaintiff's reply memorandum of law. (Dkt. No. 216 at 12.) More specifically, Plaintiff filed its expert disclosure on June 23, 2011. (Dkt. No. 211, Attach. 8.) Plaintiff filed its motion for partial summary judgment on September 30, 2011. (Dkt. No. 193.) Defendants did not object to, or move for preclusion of, Plaintiff's expert's testimony until it responded to Plaintiff's motion for partial summary judgment on November 11, 2011. (Dkt. No. 213, Attach. 1.) Had Defendants felt genuinely prejudiced, they had ample opportunity to move for preclusion, including (but not limited to) during the telephone conference with Magistrate Judge Baxter on July 11, 2011, where Defendants first learned of Plaintiff's intention to file a motion for summary judgment. (Dkt. No. 216, Attach. 8 at 24-26.)

In addition, Defendants' motion to strike Plaintiff's expert is untimely because, according to

Judge Sharpe's Amended Pretrial Scheduling Order, Defendants were required to move to

preclude Plaintiff's expert's testimony on or before the deadline for dispositive motions.  (Dkt.

No. 43 at 3 ["Motions to preclude expert witness testimony must be filed and served on or before

the dispositive motion deadline as set forth . . . below."].)  For the reasons stated in Part III.A.1.

of this Decision and Order, the deadline for dispositive motions was September 30, 2011.

For all of these reasons, the Court finds that, although Plaintiff's expert disclosure was

untimely, Defendants are not prejudiced by Plaintiff's untimeliness.  As a result, the Court

rejects Defendants' untimeliness challenge to Plaintiff's expert declaration.

### b.     Formal Sufficiency of Expert Report

After carefully reviewing the parties' arguments and the relevant law, the Court is not

persuaded that Plaintiff was required to accompany its expert disclosure of Dr. Acland with an

expert report pursuant to Fed. R. Civ. P. 26(a)(2)(B).  More specifically, Plaintiff's expert

disclosure explicitly states that he "has not been retained or specially employed to provide expert

testimony in the case, and his duties do not regularly involve giving expert testimony."  (Dkt.

No. 211, Attach. 8 at 3.)  Plaintiff's expert disclosure also explicitly states that Dr. Acland "will

not be compensated for his work or testimony in this case."  (*Id.*)  Finally, neither Judge Sharpe's

Amended Pretrial Scheduling Order in this case nor the Local Rules of Practice for this Court

appears to require that Plaintiff accompany its expert disclosure of Dr. Acland with an expert

23

report.[9]

For all of these reasons, Defendants' motion to strike Plaintiff's expert declaration is denied.

**B.    Plaintiff's Motion for Partial Summary Judgment**

As discussed more completely above in Part I.C. of this Decision and Order, Plaintiff argues that it is entitled to summary judgment on its (1) patent infringement claims against Defendants PinPoint, InGen, and Dobbins, (2) misrepresentation claims against Defendants InGen and Dobbins, (3) unfair competition claims against  Defendants PinPoint, InGen, and Dobbins, (4) successor liability claim against Defendant InGen, and (5) its individual liability

---

[9]    Judge Sharpe's Amended Pretrial Scheduling Order provides, in pertinent part, as follows:

> **6.    DISCOVERY**: . . .
>
> **Special procedures for management of expert witnesses:**
>
> There will be binding disclosure of the identity of expert witnesses (including a curriculum vitae) as set forth below.
>
> **A.    Expert Reports.**  With regard to experts who are retained or specially employed to provide expert testimony in the case or whose duties as an employee of the party regularly involve giving expert testimony:
>
> > **(1)**    . . . PLAINTIFF(S) shall identify any expert(s) and, unless waived, shall serve on the other parties the expert's written report pursuant to Fed. R. Civ. P. 26(a)(2)(B).

(Dkt. No. 43 at 2.)  The Local Rules provide, in pertinent part, as follows:

> The parties shall make such disclosure, including a *curriculum vitae* and, unless waived by the parties, service of the expert's written report pursuant to Fed. R. Civ. P. 26(a)(2)(B) . . . .

N.D.N.Y. L.R. 26.3.

claim against Defendant Dobbins.  (*See generally* Dkt. No. 193, Attach. 1.)  The Court addresses each below separately.

### 1.      Patent Infringement Claims Against Defendants PinPoint, InGen, and Dobbins

After carefully considering the matter, the Court denies Plaintiff's motion for partial summary judgment on its infringement claims against Defendants PinPoint, InGen, and Dobbins for the following three reasons.  First, Plaintiff has failed to adduce sufficient admissible evidence to conclusively establish that Defendants' PRCD testing methods infringe on each and every one of Plaintiff's '388 and '037 patents.  *See Laitram Corp.*, 939 F.2d at 1535 ("To establish infringement, every limitation set forth in a patent claim must be found in an accused product or process exactly or by a substantial equivalent.")  More specifically, Plaintiff has failed to provide the Court with an adequate description of Defendants' PRCD testing method that would allow the Court to undertake a comparison between the claimed methods and Defendants' methods.  However, even assuming that the evidence submitted by Plaintiff is adequate to undertake such a comparison, the Court cannot conclude that Defendants' methods practice even claim one of the '388 patent.  Claim one of the '388 patent claims a method for detecting the presence of at least one genetic marker in a canine subject that is genetically linked and co-segregating with a PRCD trait wherein at least one genetic marker consists of a polymorphism that is located on canine chromosome 9.  (Dkt. No. 1, Attach. 2 at 24; Dkt. No. 194, Attach. 3 at 25.)  In her deposition where she explains Defendants' PRCD testing methods, Dr. Conant fails to discuss (or even mention) chromosome 9.  (Dkt. No. 194, Attach. 5 at 18-25.) Because, in the Court's reading of claim one of the '388 claim, chromosome 9 is integral to determining whether a canine subject has a genetic marker for PRCD, the Court finds that Plaintiff has failed to prove that even claim one of the '388 patent is practiced by Defendants'

PRCD testing method.[10]

Second, assuming for the sake of argument that Defendant PinPoint's PRCD testing

methods (as conducted at Texas A&M University) infringed on the '388 and '037 patents,

Plaintiffs have failed to adduce sufficient admissible record evidence to conclusively establish

that Defendant InGen's PRCD testing methods (as conducted in The Bahamas) are identical to

the methods used by Defendant PinPoint.[11]   More specifically, Defendant Dobbins testified about

Defendants' PRCD testing method; however, he could not testify with any authority or reliability

on portions of the test that would, if proven, demonstrate that the Defendants' test practiced all

claims of either the '388 or '037 patent.   For example, Defendant Dobbins testified at his

deposition as follows:

> Q:   The diagnostic test is designed to locate this G to A change we
>       discussed?
> A:   Yes.
> Q:   That G to A change is located at a specific place on the DNA that
>       is tested, correct?
> A:   That is my understanding, yes.
> Q:   Do you understand that that change occurs at the sequence spot
>       1298 on the DNA strand?
> A:   I've never heard that number before.
> Q:   Have you ever heard any number associated with where the
>       mutation would be located?
> A:   No.

(Dkt. No. 196, Attach. 2 at 228-29.)   Claim one of the '037 patent claims a method of identifying

a dog as genetically normal, a carrier of, or predisposed to PRCD by testing a nucleic acid

sample from a dog for "a G to A transversion in the F04 gene at nucleotide position 1298 of SEQ

---

[10]      The Court makes this conclusion notwithstanding Dr. Acland's declaration
concluding that Defendants' method practices claim one of the '388 patent because Dr. Acland's
declaration is conclusory, and, like Dr. Conant, Dr. Acland's declaration fails to undertake a
specific analysis each of the 39 claims in the '388 patent.  (Dkt. No. 194, Attach. 1 at 7.)

[11]      As discussed above, although Dr. Conant testified to the PRCD testing method
used by Defendants, the Court finds this description either incomplete or, if complete,
insufficient to establish infringement.

ID NO:1."  (Dkt. No. 1, Attach. 3 at 40; Dkt. No. 194, Attach. 4 at 41.)  In addition, although Dr. Conant testified about the Defendants' PRCD testing methods at Texas A&M University (Dkt. No. 194, Attach. 5 at 18-25), it is not clear that Defendant InGen uses precisely the same method in The Bahamas, because Defendant Dobbins testified that the testing method "change[d] to a certain degree" in The Bahamas. (Dkt. No. 196, Attach. 2 at 110-11.)[12]

Third, in any event, Defendants' "admissions"–while certainly probative of Defendants' liability on Plaintiff's patent infringement claim–are not sufficient to conclusively establish that Defendant InGen uses, sells, or offers to sell Plaintiff's '388 or '037 patents in the United States. (Dkt. No. 193, Attach. 1 at 17.)  In particular, Defendant Dobbins' email dated October 27, 2008, states only that Plaintiff's '037 patent is "very strong" and would "*probably* prohibit any lab from using this process within the jurisdiction covered by the patent."  (*Id.* [emphasis added.]) Without more, this statement does not amount to infringement of Plaintiff's '037 patent because it indicates that Defendant Dobbins (who, by his own deposition testimony, is not qualified to make scientific conclusions[13]) believes that it is only *likely* (as compared to *certain*) that the '037 patent would prohibit anyone in the United States from using it.  Put simply, in the Court's view, while the statement contained in the email certainly suggests that one or more Defendants could have infringed (or could be infringing) on Plaintiff's patents, that statement does not conclusively establish such infringement for purposes of summary judgment.

---

[12]      The Court makes this ruling notwithstanding Defendants' Rule 7.1 Response, in which Defendants admitted that "[t]he testing methods for prcd used in the Bahamas do not differ in any way from the methods that Texas A&M used at its own lab in Texas."  (Dkt. No. 212 at 7.)  Indeed, such discrepancies in the record give the Court further reason to deny Plaintiff's motion for partial summary judgment on its infringement claims, because it demonstrates factual inconsistencies more appropriately resolved by a fact finder at trial.

[13]      (Dkt. No. 196, Attach. 2 at 227 [Def. Dobbins testifying that "I got into this thing with very limited knowledge of the overall science.  I've educated myself over the last few years, but as I have said when looking at some of these patents, it doesn't mean anything to me, I mean that is from a business man's standpoint, if somebody is not trained, I just don't know"].)

Similarly, the statements on Defendant InGen's website (described above in note 5 of this Decision and Order) amount to advertisements or marketing statements that, while certainly probative of the alleged patent infringement,[14] are insufficient to conclusively establish that infringement for purposes of summary judgment.  *See PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*, 491 F.3d 1342, 1351 (Fed. Cir. 2007) ("The trial court was correct in ruling that the evidence of the defendants' advertising and other materials did not provide a sufficient basis for a finding of infringement.").[15]  In particular, the statements are couched in qualified terms such as "*may* have *some* infringement liability," "patent *issues*," "*certain* genetic tests," "*many* of our premium tests," "*certain* jurisdictions," "*some* of the methods."  *See, supra,* note 5 of this Decision and Order [emphasis added].  Furthermore, it is true that one of Defendant InGen's statements on its website indicates to clients that "[s]ome of the [scientific] methods [used in certain genetic tests marketed and sold by Defendant InGen] have been patented in the United States . . . .  These method patents prohibit unlicensed use of the scientific techniques used in the detection of mutations for some diseases within [the United States] . . . ."  *Id*.  However, the phrase "some of" prevents the Court from concluding that this statement specifically refers to Plaintiff's patented methods.  *Id*.  Moreover, the statement does not expressly admit that any Defendant has used, sold, or offered to sell a protected method patent belonging to Plaintiff within the United States.  *Id*.  Indeed, another statement qualifies the purported "admission," by

---

[14]    *See Johnson & Johnson v. Carolina Lee Knitting Co.*, 258 F.2d 593, 599 (4th Cir. 1958) ("While advertising claims alone may not be sufficient to make out a case of infringement, . . . the Courts have[,] in numerous instances[,] relied on advertisements as admissions by the defendant of the infringing nature of the accused product.") (collecting cases; omitting citation).

[15]    The Court also notes that, although Plaintiff's motion for partial summary judgment is (admittedly) based primarily on Defendants' admissions (Dkt. No. 193, Attach. 1 at 6), Plaintiff fails to cite any legal authority supporting a conclusion that the type of statements on which Plaintiff relies for its patent infringement claim are sufficient, under any circumstances, to grant its motion (*see generally* Dkt. No. 193, Attach. 1).

claiming, "[InGen] is not violating any . . . international patent laws by processing the PRCD test." *Id*.

While all the statements together certainly present a close issue for purposes of summary judgment, they do not suffice to eliminate any genuine dispute of material fact.  (This is especially true given that, as stated above, Plaintiff has failed to provide the Court with an adequate description of Defendants' PRCD testing method that would allow the Court to undertake a comparison between the claimed methods and Defendants' methods.)

For each of these reasons, Plaintiff's motion for partial summary judgment on its patent infringement claims is denied.

### 2.     Misrepresentation Claims Against Defendants InGen and Dobbins

Plaintiff argues that the following five statements, made by Defendants InGen and Dobbins, give rise to liability for misrepresentation under the Lanham Act: (1) "[Defendant] InGen is 'a corporation operating in the Bahamas[]' and is 'headquartered in the Bahamas"; (2) "All business between [Defendant] InGen and its customers is transacted off-shore"; (3) "[W]hen a sale is made, the entire transaction is conducted outside any jurisdiction covered by any patent"; (4) "The prcd 'method patents were never filed in The Bahamas and therefore it is perfectly legal and ethical to use the scientific processes in the Bahamian jurisdiction'"; and (5) "[Defendant] PinPoint, as a company, is no longer involved with [Defendant] InGen."  (Dkt. No. 193, Attach. 1 at 24.)

The Court finds that the first statement (i.e., relating to where Defendants InGen and Dobbins conduct business operations) does not implicate "an inherent or material quality of the product." *Time Warner Cable, Inc.*, 497 F.3d at 153 n.3.  Whether true or false, this statement is not sufficient to give rise to a claim under the Lanham Act for false advertisement.

The fifth statement (i.e., relating to whether Defendant PinPoint is involved with Defendant InGen) gives rise to an action for false designation of origin under the Lanham Act.[16] After carefully considering the matter, the Court finds that there is a genuine dispute of material fact as to whether the statement that "[Defendant] PinPoint, as a company, is no longer involved with [Defendant] InGen" is literally false.  More specifically, the Court finds the following evidence creates a genuine dispute as to whether Defendant PinPoint is "involved with" Defendant InGen: (1) Defendant PinPoint has not received consideration for the assets it transferred to Defendant InGen in December 2008 (Dkt. No. 196, Attach. 2 at 124, 142; Dkt. No. 211, Attach. 1 at 24; Dkt. No. 211, Attach. 11 at 3); (2) Defendant PinPoint still exists as a business entity (Dkt. No. 196, Attach. 2 at 142; Dkt. No. 211, Attach. 1 at 24; Dkt. No. 211, Attach. 11 at 3); (3) Defendant PinPoint paid Defendant Genetic for Defendant Genetic's services up until January 2010, even though Defendant InGen supposedly purchased Defendant PinPoint's assets in 2008 (Dkt. No. 196, Attach. 4 at 46-47); and (4) Defendant InGen's website states, unequivocally, that Defendant PinPoint, "as a company, is no longer involved with [Defendant] InGen" (Dkt. No. 196, Attach. 32).  If Defendant PinPoint is, as Plaintiff alleges, involved with Defendant InGen, then Defendant InGen could be liable under the Lanham Act, because it is possible that "an appreciable number of ordinary prudent purchasers [could] be misled, or indeed simply confused" as to whether the services for which they have paid is undertaken by Defendant PinPoint or Defendant InGen.  *Mushroom Makers, Inc.*, 580 F.2d at 47. However, because it is unclear from the record evidence whether Defendant PinPoint is, or is

---

[16]      "The ultimate inquiry in most actions for false designation of origin . . . is whether there exists a 'likelihood that an appreciable number of ordinary prudent purchasers [will] be misled, or indeed simply confused, as to the source of the goods in question.'" *Thompson Medical Co., Inc. v. Pfizer, Inc.*, 753 F.2d 208, 213 (2d Cir. 1985) (quoting *Mushroom Makers, Inc. v. R.G. Barry Corp.*, 580 F.2d 44, 47 [2d Cir. 1978]).

not, involved with Defendant InGen, Plaintiff's motion for partial summary judgment on its

Lanham Act claim, as it results to the fifth statement, is denied.

As for the second, third and fourth statements, the Court finds those statements are

literally false.  More specifically, regarding the second and third statements, it is undisputed that,

when a customer purchases a test from Defendant InGen, at least part of the "transaction" takes

place in the United States.[17]  In addition, regarding the fourth statement (i.e., suggesting that

Defendants' PRCD testing methods are "perfectly legal and ethical" because the '388 and '037

"method patents were never filed in The Bahamas," see Dkt. No. 196, Attach. 32 at 4), the Court

finds that statement literally false because whether Defendants InGen and Dobbins' PRCD

testing methods practice all of the claims of Plaintiff's '388 and '037 patents (or are substantially

equivalent to the patents) remains a genuine dispute of material fact, as discussed more

completely in Part III.B.1. of this Decision and Order.[18]  Given the Court's finding that there

remains a genuine dispute of material fact as to whether Defendants have infringed on Plaintiff's

'388 and '037 patents, and the Court's Order dated March 8, 2011, denying Defendants' motion

---

[17]     (See Dkt. No. 212 at 6-8 [Defs.' Rule 7.1 Response admitting that (1) Def. InGen's only employee works in its Marietta, Georgia location and has never traveled to The Bahamas, (2) Def. Genetic (located in the same office as Def. InGen in Marietta, Georgia) assigns customer order numbers, packages and sends testing kits to customers, and receives the specimen sample from the customer for genetic testing, (3) Def. InGen contracts with a company in California to extract the necessary DNA from the specimen sample received by Def. Genetic, and (4) after the DNA is extracted by the company in California, Def. InGen (from Marietta, Georgia) forwards the DNA sample to its laboratory in The Bahamas].)

[18]     For the reasons already discussed in the Court's Order dated March 8, 2011 (Dkt. No. 181), ruling on Defendants' motion for summary judgment, and the Court's Order dated March 17, 2011 (Dkt. No. 183), ruling on Defendants' motion for reconsideration, the Court rejects Defendants' argument that, notwithstanding whether its PRCD testing methods practice each and every claim of Plaintiff's patents or are substantially equivalent to the patents, it has not infringed on Plaintiff's patents because Defendant InGen's offers to sell, and sales, of the PRCD tests occur offshore (Dkt. No. 213, Attach. 1 at 15-18).

for summary judgment based on its argument that moving its testing site offshore insulates them from patent liability, the Court finds that Defendants' statements to its customers purporting to conclude that its business operations are legal "conflicts with reality." *Schering Corp.*, 189 F.3d at 229.

For all of these reasons, Plaintiff's motion for partial summary judgment on its Lanham Act claims against Defendants InGen and Dobbins is denied as it relates to the first and fifth statements described above. However, Plaintiff's motion for partial summary judgment on its Lanham Act claims against Defendants InGen and Dobbins is granted as it relates to the second, third, and fourth statements described above.

### 3.   Unfair Competition Claims Against Defendants PinPoint, Ingen, and Dobbins

As discussed in Part III.B.1. of this Decision and Order, the Court is unable to conclude, based on the current record, that Defendants' PRCD testing methods practice each and every claim of Plaintiff's '388 and '037 patents or are substantially equivalent to the patents. As a result, the Court cannot conclude that Defendants engaged in an "unauthorized reproduction and distribution of [Plaintiff's] work" to hold Defendants liable under a theory of unfair competition. *Cf. Five Star Mfg., Inc. v. Ramp Lite Mfg., Inc.*, 44 F. Supp.2d 1149, 1157-58 (D. Kan. 1999) (finding that the plaintiff's unfair competition claim fails for the same reasons that the plaintiff's infringement claim fails). For these reasons, Plaintiff's motion for partial summary judgment on its unfair competition claims is denied.

### 4.   Successor Liability Claim Against Defendant InGen

### a.   "De Facto Merger" Theory of Successor Liability

After carefully considering the matter, the Court finds that there is a genuine dispute of material fact as to whether Defendants PinPoint and InGen engaged in a "de facto merger."

Although there is evidence of a continuity in ownership, management, personnel, and physical location between the two entities,[19] Plaintiff has failed to adduce sufficient admissible record evidence to conclusively establish that Defendant PinPoint has ceased all operations, or that Defendant InGen has assumed "the liabilities ordinarily necessary for the uninterrupted continuation of [Defendant PinPoint's] business." *In re New York City Asbestos Litig.*, 15 A.D.3d at 256 (listing the four factors considered when determining successor liability).

For example, the following facts are undisputed: (1) Defendant PinPoint has not yet transferred its assets to Defendant InGen (Dkt. No. 196, Attach. 2 at 124, 142; Dkt. No. 211, Attach. 11 at 3l; Dkt. No. 212 at 3); (2) Defendant PinPoint still exists as a corporate entity (Dkt. No. 211, Attach. 11 at 3); (3) for some period of time after Defendant InGen allegedly purchased Defendant PinPoint, Defendant PinPoint purchased the assays needed for Defendant InGen to undertake PRCD testing, and Defendant InGen, in turn, purchased the assays from Defendant PinPoint (Dkt. No. 196, Attach. 2 at 172); and (4) Defendant PinPoint still has six shareholders (Dkt. No. 196, Attach. 2 at 152; Dkt. No. 211, Attach. 11 at 4; Dkt. No. 212 at 2).

Based on this evidence, the Court finds that a rational factfinder could conclude that Defendant PinPoint is more than just a mere "shell" of an entity. *Fitzgerald*, 286 A.D.2d at 575.

---

[19]     Defendant Dobbins is one of the shareholders of Defendant PinPoint and is also the sole shareholder of Defendant InGen. (Dkt. No. 184 at 2 [Defs.' Answer to Plf.'s Am. Cmplt.]; Dkt. No. 211, Attach. 11 at 4 [Def. Dobbins' declaration].) Defendant Dobbins is the CEO of Defendant PinPoint, and is the general manager and CEO of Defendant InGen. (*Id.*; Dkt. No. 196, Attach. 2 at 152 [Def. Dobbins' deposition testimony].) Sherrill Williams was an employee of Defendant PinPoint until December 31, 2009 (Dkt. No. 212 at 3 [Defs.' Rule 7.1 Response]), began working for Defendant InGen January 1, 2010 (Dkt. No. 196, Attach. 3 at 8 [Williams' deposition testimony]), and is now the sole employee of Defendant InGen (Dkt. No. 212 at 3 [Defs.' Rule 7.1 Response]). Defendants PinPoint and InGen maintain the same place of business in Marietta, Georgia, located at 1395 Cobb Parkway NW (although Defendant InGen also maintains a place of business at 8B Town Center, Woodstock Street, Freeport, The Bahamas). (Dkt. No. 184 at 2 [Defs.' Answer to Plf.'s Am. Cmplt.].)

### b.      "Mere Continuation" Theory of Successor Liability

Because Defendant PinPoint survived Defendant InGen's purchase (and therefore still exists as a business entity), Defendant InGen cannot be liable under a "mere continuation" theory of successor liability.  *See Schumacher*, 59 N.Y.2d at 245 ("Since [the predecessor] survived the instant purchase agreement as a distinct, albeit meager, entity, the Appellate Division properly concluded that [the successor] cannot be considered a mere continuation of [the predecessor].").

For all of these reasons, Plaintiff's motion for partial summary judgment on its successor liability claim against Defendant InGen is denied.

### 5.      Individual Liability Claim Against Defendant Dobbins

After carefully considering the matter, the Court finds that Plaintiff has failed to adduce sufficient admissible record evidence to obtain summary judgment on its individual liability claim against Defendant Dobbins for two reasons.  First, even assuming that Defendant Dobbins dominates every aspect of both [Defendants] Ingen and PinPoint, standing alone, this is not enough to pierce the corporations' veils.  *See Matter of Morris*, 82 N.Y.2d at 141-42 ("While complete domination of the corporation is key . . ., standing alone, [it] is not enough.").

Second, Plaintiff has adduced no admissible record evidence establishing that Defendant Dobbins' alleged domination was used to further his personal business or that Defendant Dobbins' alleged domination perpetuated "a wrong or injustice" against Plaintiff.  *Matter of Morris*, 82 N.Y.2d at 141-42.  Although it is undisputed that Defendant InGen was created "for the sole purpose of offering patent-protected genetic tests from an offshore site where the patents-in-suit were not registered" (Dkt. No. 212 at 2 [Defs.' Rule 7.1 Response]), Plaintiff has not adduced admissible record evidence establishing that this warrants holding Defendant

Dobbins individually liable.  More specifically, Plaintiff has failed to adduce admissible record evidence establishing that (1) Defendant InGen was created as a direct result of Defendant Dobbins' alleged domination, or (2) even if Defendant InGen was created through Defendant Dobbins' alleged domination, it was an abuse of the "privilege of doing business in the corporate form."  *See Matter of Morris*, 82 N.Y.2d at 142 ("The party seeking to pierce the corporate veil must establish that the owners, through their domination, abused the privilege of doing business in the corporate form to perpetuate a wrong or injustice against that party.")

For these reasons, Plaintiff's motion for partial summary judgment on its individual liability claim is denied.

**ACCORDINGLY**, it is

**ORDERED** that Defendants' motion to strike Plaintiff's motion for partial summary judgment and its expert declaration (Dkt. No. 211) is **DENIED**; and it is further

**ORDERED** that Plaintiff's motion for partial summary (Dkt. No. 193) is **GRANTED in part** and **DENIED in part** as follows:

1.  Plaintiff's motion for partial summary judgment on its patent infringement claims against Defendants PinPoint, InGen, and Dobbins is **denied**;

2.  Plaintiff's motion for partial summary judgment on its Lanham Act claims against Defendants InGen and Dobbins, as they relate to the first and fifth statements, as described in Part III.B.2. of this Decision and Order, is **denied;**

3.  Plaintiff's motion for partial summary judgment on its Lanham Act claims against Defendants InGen and Dobbins, as they relate to the second, third, and fourth statements, as described in Part III.B.2. of this Decision and Order, is **granted**;

4.      Plaintiff's motion for partial summary judgment on its unfair competition claims against Defendants PinPoint, InGen, and Dobbins is **denied**;

5.      Plaintiff's motion for partial summary judgment on its successor liability claim against Defendant InGen is **denied**;

6.      Plaintiff's motion for partial summary judgment on its individual liability claim against Defendant Dobbins is **denied**; and it is further

**ORDERED** that counsel are directed to appear on AUGUST 1, 2012 at 2:00 p.m. in chambers for a pretrial conference, at which counsel are directed to appear with settlement authority, and in the event that the case does not settle, trial will be scheduled at that time. Plaintiff is further directed to forward a written settlement demand to defendants no later than JULY 20, 2012, and the parties are directed to engage in meaningful settlement negotiations prior to the August 1, 2012 conference.

Dated: June 29, 2012
      Syracuse, New York

Hon. Glenn T. Suddaby
U.S. District Judge